UNITED STATES v. STOCKYARDS TERMINAL RY. CO.

(Circuit Court of Appeals, Eighth Circuit.   March 23, 1910.)

No. 3,165.

CARRIERS (§ 37*)—TRANSPORTATION OF LIVE STOCK—TWENTY-EIGHT HOUR LAW—TERMINAL CARRIER—"KNOWINGLY AND WILLFULY."

Where defendant, a terminal railroad company, received cattle from a connecting carrier for the sole purpose of transporting them to certain stockyards to feed, water, and rest them, and then to return them to the carrier from which they have been received, not knowing that such carrier had already confined them in the cars exceeding the time allowed by Act June 29, 1906, c. 3594, § 1, 34 Stat. 607 (U. S. Comp. St. Supp. 1909, p. 1178). providing that cattle shall not be confined for a longer period than 36 hours, the terminal carrier, having used due diligence in carrying the cattle to the stockyards and unloading them, was not guilty of itself "knowingly and willfully" violating such act; such words being intended to mean either an intentional violation of the statute or an indifferent disregard of its requirements.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. § 37.*

For other definitions, see Words and Phrases, vol. 5, p. 3939.]

In Error to the Circuit Court of the United States for the District of Minnesota.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Action by the United States against the Stockyards Terminal Railway Company for violation of the 28-hour law. Judgment for defendant (172 Fed. 452), and plaintiff brings error. Affirmed.

Charles C. Houpt, U. S. Atty.

Robert E. Olds (Frank B. Kellogg, C. A. Severance, and Henry Veeder, with him on the brief), for defendant in error.

Before SANBORN and ADAMS, Circuit Judges, and RINER, District Judge.

RINER, District Judge. This was an action brought by the United States against the defendant to recover a penalty for an alleged failure to comply with the provisions of section 1 of the act of Congress of June 29, 1906 (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1909, p. 1178]), known as the "28-hour law." The parties are arranged in this court as they were in the court below, the plaintiff in error being the plaintiff, and the defendant in error being the defendant, and they will be hereafter referred to as plaintiff and defendant, respectively.

The petition originally contained two causes of action, but before the trial the second cause of action was dismissed by the plaintiff. A jury was waived by a stipulation in writing, and the case was tried by the court without the intervention of a jury, upon the following agreed statement of facts:

"It is hereby stipulated by and between the parties to the above-entitled cause that the same may be tried by the court without a jury, on the following facts without other or further proof:

"(1) The defendant, Stockyards Terminal Railway Company, is, and during all of the times mentioned in the complaint was, a corporation duly organized and existing under the general laws of the state of Minnesota relating to the incorporation of railroad companies. The said defendant during all of said times operated a line of road from Dayton's Bluff, a point at the southern extremity of the Union Depot Yards in St. Paul, Minn, to the yards of the St. Paul Union Stockyards Company at South St. Paul, Minn. The said defendant does not own its own line, but under contract of lease operates over the main line tracks of the Chicago, Milwaukee & St. Paul Railway Company and the Chicago, Burlington & Quincy Railway Company from the said Dayton's Bluff to Newport and St. Paul Park, whence it crosses the Mississippi river, using the tracks and bridge of the Chicago, Rock Island & Pacific Railway Company to Inver Grove, in Dakota county, Minn., and thence uses the tracks of the Chicago, Rock Island & Pacific Railway Company to the St. Paul Union Stockyards at South St. Paul, Minn. The total distance by the route above described from Dayton's Bluff to the said Union Stockyards is about 11 miles, and the greater part thereof—that is to say, from Dayton's Bluff to the point crossing the Mississippi river—is over the tracks of the Chicago, Burlington & Quincy Railway Company and the Chicago, Milwaukee & St. Paul Railway Company, which constitute the main lines of said companies, respectively, between St. Paul, Minn., and Chicago, Ill.

"(2) The shipment involved in the first cause of action set forth in the complaint herein was delivered to defendant at the said Dayton's Bluff solely for the purpose of being transported to the said St. Paul Union Stockyards at South St. Paul for feeding, watering, and resting the stock. The shipment consisted of five car loads of cattle, all shipped by the same consignor to the same consignee. The shipment was billed from Lavina, Mont., to the Union Stockyards at Chicago, Ill., by way of the Chicago, Milwaukee & St. Paul Railway. The said shipment was not billed via the defendant's line, and the defendant did not perform any other service with respect thereto than that of

transporting the same from the main line tracks of the said Chicago, Milwaukee & St. Paul Railway Company at or near said Dayton's Bluff to the said St. Paul Union Stockyards for the purpose of feeding, watering and resting the stock, and thence back again to said main line tracks of said Chicago, Milwaukee & St. Paul Railway after the cattle comprised in the said shipment had been rested, watered, and fed at said St. Paul Union Stockyards. Hereto attached marked 'Exhibit A,' and consisting of five sheets, are the original waybills covering the said shipment, each of said waybills relating to one of the five car loads mentioned.

"The defendant at none of the times mentioned in the complaint herein had any knowledge or information concerning the shipment involved in the said first cause of action other than that contained in the said waybills hereto attached and marked 'Exhibit A.' The said waybills were delivered to the defendant simultaneously with the cars to which they related. The usual 36-hour release was attached to each of said waybills.

"It is customary for live stock to arrive at St. Paul from western points in the early morning hours. Between the hours of 1 o'clock a. m. and 8:30 a. m. of August 3, 1908, 119 car loads of live stock were delivered to the defendant company at said Dayton's Bluff for transportation to the said St. Paul Union Stockyards at South St. Paul, Minn., and at the time when the five cars referred to in Exhibit A were delivered to the defendant, to wit, at 6:35 a. m. on said August 3, 1908, there were delivered to the defendant at said Dayton's Bluff for transportation as aforesaid altogether 67 car loads of live stock, together with the waybills therefor.

"It is customary in transporting live stock for the agents of the railway companies engaged in such transportation, and it is their duty, to note and enter upon the waybills the times and places of feeding, resting, and watering the live stock, together with the charges therefor; but this practice is not invariable, and sometimes said agents do not make such notations or entries on the waybills, and frequently the feeding charges incurred at points where the stock is fed, rested, and watered are entered upon a separate bill which may or may not be attached to the original waybill covering the shipment to which it relates.

"(3) The defendant did not have actual knowledge at any of the times mentioned in said complaint that the cattle comprised in the said shipment had been confined without unloading them for the purpose of rest, water, and feeding for a period in excess of 28 hours or a period in excess of 36 hours, or any other period of time contrary to law.

"(4) The facts with respect to the hours of delivery to and unloading by the defendant company are as follows: The said five cars were delivered to the defendant by the Chicago, Milwaukee & St. Paul Railway Company at said Dayton's Bluff at 6:35 a. m. on August 3, 1908, and were unloaded at the St. Paul Union Stockyards at 8:40 a. m. on said August 3, 1908. The period of time consumed by the defendant in transporting said shipment of five cars from said Dayton's Bluff to the said St. Paul Union Stockyards at South St. Paul and unloading the same was reasonable, and not longer than was necessary for the transportation of said live stock between the points named, and the unloading of the same.

"(5) The said St. Paul Union Stockyards at South St. Paul, Minn., are the nearest yards and most accessible facilities for unloading, resting, feeding, and watering live stock to said Dayton's Bluff, the point of delivery of said shipment to the defendant, and if the said shipment had been declined by the defendant, or turned back to the Chicago, Milwaukee & St. Paul Railway Company, at said Dayton's Bluff, it would have been necessary to transport the same to other and more distant yards, and the time consumed in so transporting the said shipment to other yards would have been greater than that actually consumed by the defendant in transporting the same to said St. Paul Union Stockyards.

"(6) At the same time that this action was begun by the plaintiff against the defendant on account of the matters set forth in the first cause of action in the complaint herein a similar action was begun by the same plaintiff against the Chicago, Milwaukee & St. Paul Railway Company on a cause of action identical with the first cause of action in the complaint herein, in that

it related to the same shipment and the same alleged violation of law; and in the said action against the Chicago, Milwaukee & St. Paul Railway Company that company conceded the truth of the allegation in the complaint against it, said allegations being identical in substance with those in the first cause of action in the complaint herein, whereupon said Chicago, Milwaukee & St. Paul Railway Company was by this court duly fined in the sum of $250, and judgment was entered against said company for said sum. The said fine and judgment have been paid and satisfied by said Chicago, Milwaukee & St. Paul Railway Company."

We do not think the case of the United States v. New York Central & Harlem Railroad Company (C. C.) 156 Fed. 249, sustains the contention of the plaintiff. In that case a car of horses were shipped from Peru, Ind., over the Wabash Railroad Company's lines through the states of Ohio and Michigan, and thence through the province of Ontario, Canada, to the city of Buffalo, in the state of New York, where they were delivered to the defendant, a connecting carrier. The court, in the course of its opinion, said:

"I am cited no authority by either side, and I have found none bearing upon the precise question involved, but I think that, as the horses were kept on cars by the defendant railroad company about three or four hours after the expiration of 28 consecutive hours before they were rested and fed, it is liable for negligence per se."

The case was presented to the court upon a demurrer to the complaint, and the court held that whether the defendant knowingly or willfully failed to meet the requirements of the statute was a question to be submitted to a jury.

It is to be noticed in the case now before us that the shipment of the five cars of cattle, the subject of this controversy, was billed from Lavina, Mont., to the Union Stockyards in Chicago, Ill., by way of the Chicago, Milwaukee & St. Paul Railway Company; that the shipment was not billed over the defendant's line, or any part of it; that the defendant did not perform any service with respect to the cattle, other than that of transporting them from the line of the Chicago, Milwaukee & St. Paul Railway Company at Dayton's Bluff to the St. Paul Union Stockyards, a distance of about 11 miles; that it received and transported them over its line of road only for the purpose of feeding, watering, and resting the stock, and, after that had been done, it returned them again to the lines and tracks of the Chicago, Milwaukee & St. Paul Railway Company, to be forwarded on by that company to their destination. It is also admitted that it used all due diligence in handling the cattle while they were in its possession.

In response to a question by a member of the court during the argument, plaintiff's counsel was obliged to admit that if the defendant had refused to receive the cattle for the only purposes for which it did receive them, viz., feeding, watering, and resting them, such refusal would have placed the Milwaukee Railway Company in a position where it would either have to turn the cattle loose or let them remain in the cars to starve. This, it seems to us, would be an unwarranted and unreasonable construction of the statute, and, if sustained, would tend to defeat the very purpose for which it was enacted.

The real purpose of the legislation, as stated by Judge Adams, in United States v. Union Pacific Railroad Company, 169 Fed. 68, 94 C.

C. A. 433, "was to alleviate the condition of dumb animals in transit." We do not wish to be understood as deciding that the defendant could not be held liable in any case simply because a shipment was not billed over its line, or because its line did not form a part of a connecting line to be used in forwarding the cattle. It might be, where it clearly appeared that the failure to deliver the stock at the place where it was to be unloaded for the purpose of feeding, watering, and resting within the statutory period was due to unnecessary delay in transporting the stock over its line, it would be liable under the statute, but, as no such question arises in this case, we do not decide the point.

The agreed statement of facts shows that the defendant did not have actual knowledge during the time the cattle comprising this shipment were in its possession that they had been confined without unloading them for the purposes of rest, water, and feeding for a period in excess of 28 hours, or in excess of 36 hours, or any other period of time contrary to the requirements of the statute. Section 3 of the statute makes a carrier liable for the penalty for violating sections 1 and 2 of the act only when it knowingly and willfully fails to comply with the provisions of those sections. These qualifying words cannot be disregarded. In St. Louis & San Francisco Railroad Company v. United States (C. C. A.) 169 Fed. 73, Judge Van Devanter, referring to the words "knowingly and willfully," in this section of the statute, said:

"They mean something, and whatever that may be is an essential element to every right to the penalty. 'Knowingly' evidently means with a knowledge of the facts which taken together constitute the failure to comply with the statute, as is the case where one carrier receives from another a car loaded with cattle, and, with knowledge of how long they then had been confined in the car without rest, water, or food, prolongs the confinement until the statutory limit is exceeded. 'Willfully' means something not expressed by 'knowingly,' else both would not be used conjunctively. * * * But it does not mean with intent to injure the cattle or to inflict loss upon their owner because such intent on the part of a carrier is hardly within the pale of actual experience or reasonable supposition. * * * So, giving effect to these considerations, we are persuaded that it means purposely or obstinately and is designed to describe the attitude of a carrier, who, having a free will or choice, either intentionally disregards the statute or is plainly indifferent to its requirements."

See, also, United States v. Union Pacific Railroad Company, supra, to the same effect.

The defendant having received the cattle for the sole purpose of feeding, watering, and resting them, without knowing that they had been confined in the cars exceeding the time allowed by the statute, and having used due diligence in carrying them to the stockyards and unloading them, we do not think it can be said that it either intentionally disregarded the statute or was plainly indifferent to its requirements, and the judgment must be affirmed.

SANBORN, Circuit Judge. I concur in the affirmance of the judgment in this case on the ground that, conceding that the defendant knew that the St. Paul Railway Company had confined the cattle more than 36 hours when it delivered them to the defendant, yet the latter was not guilty of any offense because it did not contribute in any way to their confinement until after the statutory offense of confining them

more than 36 hours had been committed and there was no second violation of the law. The violation of the statute consisted in continuing the confinement over the 36-hour limit. When that limit had been passed the offense was complete. Neither the St. Paul Company nor those to whom it delivered the cattle could commit or aid in committing that offense again, and none of them could commit a second offense by prolonging the confinement of the cattle after the 36 hours unless they confined them 28 hours more. That was not done, but within 28 hours after the expiration of the 36 hours and as speedily as possible after it received the cattle the defendant released, fed, and watered them. United States v. Sioux City Stockyards Co. (C. C.) 162 Fed. 556, 561.